**PAKO CORPORATION, a Delaware corporation, Plaintiff,**

v.

**CITYTRUST, a State Chartered Commercial Bank under the Laws of Connecticut, Defendant.**

**Civ. No. 4–88–813.**

United States District Court,
D. Minnesota,
Fourth Division.

Dec. 8, 1989.

Robert E. Woods, Patrick T. Skelly, Briggs & Morgan, St. Paul, Minn., for plaintiff.

Richard Ihrig, Lindquist & Vennum, Minneapolis, Minn., for defendant.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on defendant's motion for summary judgment on all claims. The motion will be granted.

FACTS

Pako Corporation (Pako) is a Delaware corporation, which has historically been engaged in the manufacture and marketing of photographic, graphic arts and x-ray processing equipment.

In October of 1980, Pako's stock was purchased by Delblo Enterprises, Inc., a Minnesota corporation wholly owned by French businessman Andre Blohorn. Following the merger, Gerard Blohorn, Andrea Blohorn's son, was named chairman of Pako's board of directors.

In late 1984, the company initiated a plan to reorganize its business to respond to changes in the photo processing market,

and in mid–1985, Pako initiated negotiations with its four secured lenders to restructure its debt. In August 1985, Pako's secured lenders, First National Bank of Minneapolis, Continental Illinois National Bank & Trust Company of Chicago, Norwest Bank Minneapolis and Prudential Insurance Company of America, agreed in a letter to forgive $15.5 million in debt in exchange for a cash payment by Pako of $5.5 million.

In order to raise the money necessary to close the debt forgiveness transaction with its secured lenders, Pako decided to sell its interest in a joint venture. The sale of its joint venture, however, could not be closed quickly enough to meet the deadline imposed by the secured creditors so Pako turned to defendant Citytrust for "bridge" financing in the amount of $2 million. On November 1, 1985, Citytrust and Pako closed a transaction which consisted of a demand note in the amount of $2 million, a loan and security agreement, personal guarantees executed by Oliver Kimberly, Martha Kimberly, Peter Zecher and Jane Zecher, a pledge agreement, as well as an agreement of subordination whereby Pako's secured lenders agreed to subordinate their interests to that of Citytrust. Pursuant to the subordination agreement, which was signed by each of the secured lenders as well as by Citytrust and Pako, the parties agreed that Citytrust could assign all of the rights and obligations under the note, loan and security agreement and pledge agreement without consent of the secured lenders.

Pako claims that in order to protect its ability to offer a first secured position to future lenders, Citytrust further agreed that Pako would have the right, upon payment of appropriate consideration, to compel Citytrust to assign and transfer its rights to a third party lender identified by Pako. Pako claims that this agreement was reached orally "prior to closing of the written loan transaction" in negotiations between Pako general counsel Roger Meyer and Citytrust attorney Bruce Dillingham.

The agreement of subordination executed on November 1, 1985 contains two provisions bearing on the pending motion:

7. *Right of Assignment.* To the extent that the loan has not been paid in full at the time of the closing of such sale, the bank, without consent of the lenders, may transfer and assign the note, the loan and security agreement, the pledge agreement and this agreement and all of the rights and obligations of the parties thereunder for an amount which shall be equal to the then remaining balance of the loan. In the event of such an assignment, the parties, their successors and assigns, shall continue to be bound hereby.

. . . .

10. *Governing Law.* This agreement shall be governed by and construed in accordance with the laws of the State of Connecticut, or in the state where such rights and remedies in respect of the collateral are being asserted.

On November 27, 1985, Pako closed the sale of its interest in the joint venture. At the time of the closing, Pako received sufficient funds to pay off its entire indebtedness to Citytrust. At that time, Pako's general counsel, Meyer, asked Karl Panthen, a Citytrust loan officer and vice president responsible for the Pako account, that Citytrust leave some indebtedness remaining under the demand note in order to keep the agreement viable so that the agreement could later be transferred to a third party. Pako claims that Panthen agreed to this request, and indeed urged Pako to maintain $100,000 in indebtedness. Pako claims that in a separate conversation at approximately the same time, Panthen again recommended to Blohorn to leave some amount of indebtedness outstanding under the note, and further agreed that Citytrust would do everything that was necessary to prevent the extinguishing of that right, *i.e.,* the right of Pako to cause an assignment.

Pako also claims that sometime after closing of the joint venture sale, Citytrust orally agreed to keep the $100,000 balance outstanding under the note "until further notice." This agreement was also stated in

a letter dated March 7, 1986 by Panthen to Blohorn. That same letter notified Pako that Citytrust would not be permitting additional advances under the agreement. At about the same time, the bank released the guarantors of the agreement.

On September 2, 1986, Pako and Citytrust entered into an agreement providing Pako with a line of credit of $1.75 million. The line of credit was collateralized by a money market deposit advanced by the Kimberly Company, an investment firm owned by Pako director Oliver Kimberly.

On September 22, 1986, Citytrust unilaterally charged $100,000 against Pako's 1986 line of credit, applied that amount to the $100,000 indebtedness remaining under the 1985 demand note, stamped the demand note "paid," and returned it to Pako. Pako claims that this action by Citytrust was not authorized by the credit agreement between Pako and Citytrust. Citytrust officer John Wiggins, the individual who took over Pako's account from Panthen, testified that he cancelled the note in order to consolidate the 1985 agreement with the 1986 line of credit. Deposition of John Wiggins at 48.

Following receipt of the cancelled note, Meyer contacted Wiggins and informed him of Pako's belief that the note must have been cancelled by mistake. According to Pako, during this conversation Wiggins agreed to reinstatement of the note subject to agreement by counsel for the bank. Pako alleges that contrary to his representation, Wiggins did not in fact discuss reinstatement with anyone at the bank after he cancelled the note.

On January 13, 1987, Wiggins wrote to Meyer notifying him that he was "working with Bruce Dillingham regarding the reuse of the $2 million line of credit (sic) and will contact you this month." Affidavit of Roger Meyer ¶ 32. Again, Pako claims that this was a misrepresentation and that Wiggins did not in fact discuss reinstatement with Dillingham.

On January 16, 1987, Meyer spoke with Dillingham who stated that Citytrust could assign the note to an investor with language disclosing the fact that the note had been cancelled by Citytrust. Alternatively, Citytrust offered to assign the note to a lender located by Pako provided that Pako could secure the consent of its secured lenders, and provided that the assignee would take the note subject to the language proposed by Dillingham. Pako viewed those conditions as unacceptable.

On March 9, 1987, Pako filed a petition for reorganization under chapter 11 of the bankruptcy laws. Pako's fifth plan of reorganization was approved on July 22, 1987. The plan provided for payments of $200,000 to $300,000 over four years, without interest, to satisfy unsecured debts of $7.5 million to $10 million. As a result of the chapter 11 proceeding, the Blohorns did not give up any portion of their ownership of the equity in Pako, but were required to invest an additional $1 million in the company. Pako's potential claims against Citytrust arising out of the cancellation of the note and subordination agreement were not disclosed in the bankruptcy proceedings.

In September of 1988, Pako brought this suit against Citytrust alleging breach of contract, negligence, misrepresentation, tortious interference with business expectancy, bad faith, conversion, violation of fiduciary duty, and promissory estoppel. Pako's claims are based on the theory that it had an oral side agreement with Citytrust giving it the unilateral right to compel Citytrust to assign the 1985 loan to a lender designated by Pako. Pako also alleges that Citytrust breached an agreement to preserve an indebtedness under the 1985 loan, and breached an agreement to reinstate the loan after it had been cancelled by the advancement against the 1986 line of credit. Pako claims that these breaches deprived it of its ability to obtain financing, and proximately caused Pako to suffer diminution in its value as a going concern, lost profits, damage to credit and business reputation, as well as the costs attending the bankruptcy proceeding. On October 4, 1989, Citytrust brought the present motion for summary judgment on all counts.

## DISCUSSION

■ A movant is not entitled to summary judgment unless the movant can

show that no genuine issue exists as to any material fact. Fed.R.Civ.P. 56(c). In considering a summary judgment motion, a court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The role of a court is not to weigh the evidence but instead to determine whether, as a matter of law, a genuine factual conflict exists. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987). "In making this determination, the court is required to view the evidence in the light most favorable to the nonmoving party and to give that party the benefit of all reasonable inferences to be drawn from the facts." *AgriStor Leasing*, 826 F.2d at 734. When a motion for summary judgment is properly made and supported with affidavits or other evidence as provided in Fed.R.Civ.P. 56(c), then the nonmoving party may not merely rest upon the allegations or denials of the party's pleading, but must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585 (8th Cir.1987), *cert. denied*, 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988). Moreover, summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

I. *Effect of Chapter 11 Proceedings on Claim*

Citytrust first argues that all of Pako's claims are barred because Pako failed to disclose their existence to creditors or to the bankruptcy court when it went through chapter 11 proceedings in 1987.

Section 521(1) of 11 U.S.C. requires a debtor in bankruptcy to "file a ... schedule of assets and liabilities ... and a statement of the debtor's financial affairs." The

Code further requires that a debtor seeking protection under chapter 11 file a disclosure statement containing "adequate information," defined as:

(1) adequate information means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan....

11 U.S.C. § 1125(a)(1). The bankruptcy code broadly defines the property of a debtor's estate to include "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). This definition includes causes of action existing at the time of the commencement of the bankruptcy action. *See Miller v. Shallowford Community Hospital, Inc.*, 767 F.2d 1556, 1559 (11th Cir. 1985) (personal injury claim existing when bankrupt filed chapter 7 petition was property of estate which would be available to creditors upon petition to reopen).

■ It is uncontested that when Pako underwent chapter 11 bankruptcy proceedings in 1987 it did not list its potential claim against Citytrust as an asset. It is well established that a bankrupt is under a duty, for the benefit of its creditors, to schedule all its interests and property rights. *Oneida Motor Freight v. United Jersey Bank*, 848 F.2d 414 (3d Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988).

■ Citytrust bases its argument that the bankruptcy bars Pako's claims on theories of equitable and judicial estoppel, relying on *Oneida*, 848 F.2d 414; *In re Galerie des Monnaies of Geneva, Ltd.*, 55 B.R. 253 (Bankr.S.D.N.Y.1985), *aff'd* 62 B.R. 224 (S.D.N.Y.1986); *Monroe County Oil Co., Inc. v. Amoco Oil Co.*, 75 B.R. 158 (S.D. Ind.1987); and *In re Hoffman v. First National Bank of Akron*, 99 B.R. 929 (N.D.Iowa 1989).

In *Oneida* a debtor who had undergone chapter 11 proceedings brought a lender liability case against a bank which was also a secured creditor whose claim had been adjudicated in the bankruptcy proceeding. Seven months after the debtor's reorganization plan had been confirmed, the debtor sued the bank, alleging breaches of credit agreements as well as the bank's duty of good faith, and fraudulent misrepresentation. The court held that the plan as filed failed to alert the creditors to the possible benefits enuring to them upon the successful prosecution of the claim against the bank. *Oneida*, 848 F.2d at 418. The court noted that disclosure of potential claims as required by the Code is important not only to the achievement of finality between the parties to the bankruptcy, but also as a source of information to other creditors who vote to approve the reorganization plan. *Id.* at 417. The court held that equitable estoppel was necessary "to preserve the requisite reliability of disclosure statements and to provide assurances to creditors regarding the finality of plans which they have voted to approve...." *Id.* at 418. The court concluded that Oneida's failure to announce its potential claim in bankruptcy precluded it from litigating the cause of action. *Id.*

The court also relied upon the concept of judicial estoppel. Judicial estoppel precludes a party from assuming a position in a legal proceeding inconsistent with one previously asserted. *Id.* at 419. Judicial estoppel, according to the court, "looks to the connection between the litigant and the judicial system while equitable estoppel focuses on the relationship between the parties to the prior litigation." *Id.* The court concluded that Oneida's failure to list its claim against the bank "worked in opposition to preservation of the integrity of the system which the doctrine of judicial estoppel seeks to protect." *Id.*

In *In re Hoffman*, the debtor filed voluntary bankruptcy pursuant to chapter 11,

and the reorganization plan was confirmed on July 21, 1987. Approximately fifteen months later, the debtor sued the principal creditor in the bankruptcy proceeding on various lender liability counts, including fraud, violation of fiduciary duties, misrepresentation, negligence, and bad faith for conduct occurring prior to the date of the reorganization. The court found that the debtor knew of the potential cause of action prior to confirmation of the reorganization. The court held that the debtor was equitably estopped from asserting the claim against the bank. Equitable estoppel, according to the court, consists of the following elements:

(1) a misrepresentation or concealment of material facts by the other party, (2) lack of knowledge of the true facts by the party to whom the misrepresentation is made, (3) an intent to cause reliance on the misrepresentation, and (4) actual reliance on the misrepresentation to the detriment of the party to whom the representation was made.

*In re Hoffman*, 99 B.R. at 934, *citing International Harvester Credit Corp. v. Leaders*, 818 F.2d 655, 659 (8th Cir.1987). The court found that the bank had proven these elements by showing that the debtor had in fact concealed its intention to file a lawsuit, that the bank did not know of the intention through other means, that the bank relied on the misrepresentation in that it would not have voted to confirm the plan had it known of the potential lawsuit, and that the debtor had intended the bank to so rely. *Id.* at 935.

The court also held that judicial estoppel was appropriate, finding that the court was entitled to know about the potential future lawsuit in making its own decision about confirming the plan. The court found that in concealing the potential claim in order to assure confirmation, the debtor "played fast and loose with the bank and with this court." *Id.* at 935.[1]

---

1. The court noted the United States Court of Appeals for the Eighth Circuit's skepticism about the use of judicial estoppel expressed in *Total Petroleum Inc. v. Davis*, 822 F.2d 734 (8th Cir.1987). In *Total Petroleum*, the court stated:

The purpose of judicial estoppel is to protect the integrity of the judicial process. As we read the case law, this is tantamount to a knowing misrepresentation to or even fraud on the court. Further, the doctrine is not

In *In re Galerie des Monnaies of Geneva, Ltd.,* debtors sought to recover alleged preferential transfers from the bank the day after the plan for reorganization had been approved. The court held that "to permit Galerie this 'about face' move would seriously impair the integrity of the judicial process." *In re Galerie des Monnaies of Geneva, Ltd.,* 62 B.R. at 226. The court also noted its concern that the debtor's reversal in position also impaired the bankruptcy process:

> The disclosure statements in the course of voluntary reorganizations are critical to the decisions of creditors to accept or reject a proposed plan. When creditors vote on a plan they naturally consider the value of any possible recovery from preferential or fraudulent transfers. In this case, the information provided was false and as a result the debtor disenfranchised its creditors from casting an informed ballot on the plan and deprived the creditors of a vital protection afforded them by the Bankruptcy Code, namely adequate information.

*Id.* (citations omitted). *See also Monroe County Oil Co., Inc. v. Amoco Oil Co.,* 75 B.R. 158 (S.D.Ind.1987) (when debtor fails to disclose potential litigation "it is equitably estopped from bringing the claims after the approval of the plan of reorganization." *Id.* at 162).

Pako argues that the legal analysis of *Oneida* is faulty and that the proper approach is set forth in *In re Auto West, Inc.,* 43 B.R. 761 (D.Utah 1984). In *Auto West,* the debtor petitioned the bankruptcy court to appoint a special counsel to pursue a claim against a creditor not disclosed in a confirmed bankruptcy plan pursuant to chapter 11. The court granted the request, finding that the claim could still be pursued for the benefit of all creditors.

According to the *Auto West* court, the Code creates an estate when a petition for bankruptcy is filed, comprised of all of the debtor's property. 11 U.S.C. § 541(a). Confirmation of a chapter 11 plan vests all property of the estate in the debtor, and further provides the property *dealt with by the plan* is free and clear of all claims and interests of creditors. 11 U.S.C. § 1141(b), (c). The court held that assets not listed by the debtor in its disclosure statement are not "abandoned," but rather remain part of the estate. 11 U.S.C. § 541(d). Since the unlisted claim was not "dealt with" in the reorganization, however, it was not freed of the claims of creditors. The court held, therefore, that the unlisted claim against the bank remained part of the estate, and as such, was to be administered by the trustee or debtor in possession "for the benefit of all creditors." *Auto West,* 43 B.R. at 764. The court held that the debtor in possession could pursue the claim "strictly supervised" by the bankruptcy court, and sustained the appointment of independent counsel as being "in the best interests of the estate." The court further held that the plan provided for the continuing jurisdiction of the bankruptcy court "to enable proper distribution of any proceeds resulting from the claim against First Security." *Id.*

Pako's discussion of the *Auto West* case ignores an essential aspect of the decision, that the debtor in that case was permitted to pursue the undisclosed claim in its capacity as trustee of the estate, and that the bankruptcy court was to retain jurisdiction to oversee the equitable distribution of the proceeds from the claim. It may be true that *Auto West* states the preferable rule in that it prevents an alleged wrongdoer from receiving the windfall that would result from a finding that the claim was barred by estoppel. *See Oneida,* 848 F.2d at 422–23 (Stapleton, J., dissenting). If this is true, however, *Auto West* also means that the debtor who failed to disclose the asset does not own the cause of action free and clear of the claims of creditors, since

---

followed in a majority of jurisdictions ... partly because of its vague definition and partly because of a perceived conflict with the rule allowing parties to plead alternative legal theories.

*Id.* at 737 n. 6 (citation omitted). Nevertheless, the court in *Hoffman* relied on judicial estoppel as an alternative grounds for dismissal because the Eighth Circuit's concerns about the ability to plead alternative theories was not at issue. *In re Hoffman,* 99 B.R. at 935 n. 3.

the cause of action was not "dealt with" by the reorganization. 11 U.S.C. § 1141(c). Thus, under *Auto West*, if Pako's cause of action against Citytrust survived the bankruptcy at all, it was not relieved thereby of the claims of Pako's creditors. Under *Auto West*, if the cause of action continues, it remains subject to the claims of Pako's creditors.

The treatment of undisclosed assets was also addressed in *Stein v. United Artists Corp.*, 691 F.2d 885 (9th Cir.1982), under the former Bankruptcy Act. In *Stein*, plaintiff sought to bring various antitrust claims which had not been disclosed in chapter 11 proceedings, even though the conduct giving rise to the claims occurred prior to the bankruptcy. The court noted that courts and commentators had not considered how unlisted assets were to be pursued following completion of chapter 11 proceedings, but that the problem had been considered in the context of chapter 10 bankruptcies in which the trustee is appointed to wind down and distribute the debtor's estate. In chapter 10 bankruptcies, courts have held that a bankrupt who fails to list a potential cause of action as an asset cannot later pursue the claim because title to the "asset," *i.e.*, the cause of action, vested in the trustee. Moreover, the trustee does not "abandon" the claim to the creditor by failing to administer the claim, since if the claim was not listed, the trustee could not have been aware of it, and could not have decided to administer it for the creditors or abandon it to the debtor. The court discussed the Supreme Court decision in *First National Bank v. Lasater*, 196 U.S. 115, 25 S.Ct. 206, 49 L.Ed. 408 (1905), in which the Court held that because a debtor failed to notify either the trustee or the creditors of a claim for usury against the bank, the doctrine of abandonment did not apply, and title to the cause of action did not revest in the debtor:

> It cannot be that a bankrupt, by omitting to schedule and withholding from his trustee all knowledge of certain property can, after his estate in bankruptcy has been finally closed up, immediately thereafter assert title to the property on the ground that the trustee had never taken any action in respect to it. If the claim was of value ... it was something to which the creditors were entitled, and this bankrupt could not, by withholding knowledge of its existence, obtain a release from his debts and still assert title to the property.

*Lasater*, 196 U.S. at 119, 25 S.Ct. at 208.

The *Stein* court concluded that the rationale of *Lasater*, and the numerous cases following it, presents an even stronger case in chapter 11 bankruptcy, where it is the debtor who retains possession of the estate, rather than an independent trustee. *Stein*, 691 F.2d at 892:

> The dangers resulting from the concealment of assets are greater when the debtor remains in possession than in cases in which a third party acts as trustee. An outside trustee is a separate mechanism for discovering unlisted claims or assets. If a debtor in possession were permitted to omit claims in bankruptcy and later assert title to them, there might be an inducement to do so, to the prejudice of creditors' interests. Such a rule would undermine the fiduciary status of the debtor in possession. Whether or not the failure to list the asset in the case before us was intentional, the opportunity for concealment must be considered in formulating the proper general rule.

The court held that only "property dealt with" in bankruptcy proceedings reverts to the bankrupt upon termination of the proceedings, and that title to the antitrust claims not listed in the chapter 11 proceedings "did not revest in Century upon its discharge in bankruptcy." *Id.* at 893.

Plaintiff in *Stein* argued that it should be allowed to sue "*in custodia legis* for the benefit of creditors" until a trustee was appointed. The court rejected this request, however, finding that the property of the estate "not dealt with" in bankruptcy "remains *in custodia legis* in the bankruptcy court during the period in which no trustee has been appointed and after the discharge of the trustee...." Title may remain dormant, in the estate, until the bankruptcy court again appoints a trustee as enforcing

guardian. *Id.* at 893. The bankruptcy court held that in order to pursue the claim the debtor must petition the bankruptcy court to reopen proceedings:

> The proper procedure to enforce any newly discovered asset neither listed nor abandoned by the debtor in possession is to petition the bankruptcy court to reopen the proceedings under rule 515 to permit the court to decide whether reopening is desirable and, if so, whether the claim is to be administered for the benefit of creditors or abandoned. If the claim is to be enforced for the estate, a trustee will be appointed for its enforcement.

*Id.* at 893.

The court further held that the district court had not abused its discretion in dismissing the case, but held that ordering a stay would have been "the most sensible solution." A stay, according to the court, "would enable the trustee to intervene on behalf of creditors while at the same time permitting appellants' allegations of antitrust violations to be fully adjudicated." *Id.* at 893–94. *See also Management Investors v. United Mine Workers of America,* 610 F.2d 384 (6th Cir.1979) (chapter 11 bankrupt cannot assert cause of action not disclosed in bankruptcy proceedings).

*Stein* was decided under the former Bankruptcy Act, which provided that upon confirmation of a plan, "the title to the property *dealt with* shall revest in the ... debtor." *Stein,* 691 F.2d at 890 (emphasis added). Under the new Code, however, confirmation of a plan vests *"all* of the property of the estate in the debtor." 11 U.S.C. § 1141(b) (emphasis added). Nevertheless, subsection (c) of section 1141 still provides that only "property *dealt with* by the plan is free and clear of all claims and interests of creditors...." (Emphasis added.) Thus, under the new Code, Pako's claim against Citytrust, though undisclosed, revested in Pako after confirmation of the reorganization, but remains subject to the claims of creditors since it was not

"dealt with" in the plan. *See, In re Emmer Bros.* 52 B.R. 385 (D.Minn.1985) (antitrust claim not disclosed in Chapter 11 proceedings subject to claim of creditor after confirmation).

The Court finds that Pako's potential claim against Citytrust was not "dealt with" in the 1987 bankruptcy proceedings, and therefore was not freed of the claims of Pako's creditors. Further, the Court finds that application of the doctrine of judicial estoppel is appropriate in this case.[2] Pako argues that judicial estoppel is inappropriate because Citytrust cannot show that Pako committed either a knowing misrepresentation to or fraud on the bankruptcy court as required by *Total Petroleum,* 822 F.2d at 737 n. 6. Pako further stresses the Eighth Circuit's concerns about the application of judicial estoppel as posing a conflict with the rule allowing parties to plead alternative legal theories under Federal Rule of Civil Procedure 8(e)(2). As the court found in *In re Hoffman,* however, the latter concern is not implicated here since Pako was under an affirmative duty to disclose all assets to the bankruptcy court and to creditors in that proceeding in order to enable the court and the creditors to exercise informed decisions about how Pako should be reorganized. 11 U.S.C. §§ 521, 541, 1125. Moreover, the Court finds that Pako did in fact commit a knowing misrepresentation when it failed to bring its potential claim against Citytrust to the attention of the bankruptcy court. In its May 8, 1987 Revised Disclosure Statement filed with the bankruptcy court, Pako discussed the bridge financing obtained from Citytrust and stated only that "in September 1986 the company paid the balance of that loan." Ihrig Aff. Exh. 2 at 6. Pako general counsel and chief administrative officer Roger Meyer testified at his deposition, however, that prior to the bankruptcy filing he felt that Pako had been "wronged" by Citytrust by the manner in which Citytrust terminated the

---

**2.** It appears that the doctrine of equitable estoppel does not apply as Citytrust was not a party to the bankruptcy proceeding, and cannot claim detrimental reliance on Pako's nondisclosure in that proceeding. *See Total Petroleum Inc.,* 822 F.2d at 737 n. 6 (equitable estoppel requires reliance or prejudice before a party may invoke it).

demand note, Deposition of Roger Meyer at 184, that he had been "deceived and misled," and that Citytrust had been "dishonest." Meyer Aff. at 186. These admissions belie Pako's claim that it was unaware of its potential claim against Citytrust until after the bankruptcy proceedings. In *In re Hoffman*, the court rejected the debtor's contention that estoppel was not appropriate because the debtor was not aware of his claim at the date of filing:

> The court finds that this is not a valid reason to fail to disclose the claim. The debtor knew of all of the facts that were pertinent to its current lawsuit when it filed bankruptcy. No new information was acquired post-filing other than counsel's purported discovery of a legal basis for the lawsuit.

*In re Hoffman*, 99 B.R. at 933. As in *In re Hoffman*, the record here shows that Pako was aware prior to filing bankruptcy that there was at least the potential of a claim against Citytrust. *See In re Hoffman*, 99 B.R. at 931. The Court finds that application of judicial estoppel is necessary to prevent Pako from playing "fast and loose" with the Court and to protect the integrity of the bankruptcy process. *See In re Hoffman*, 99 B.R. at 935. Pako is therefore estopped from asserting its potential claim against Citytrust.

## II. *Credit Agreement Statute of Frauds*

Citytrust argues that Pako's claims are barred by the Minnesota credit agreement statute of frauds, Minn.Stat. § 513.33 which provides:

> A debtor may not maintain an action on a credit agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor.

Minn.Stat. § 513.33, subd. 2 (1988).[3] It is not alleged that Connecticut has a similar requirement. Therefore, if the statute applies to the alleged oral agreement between Pako and Citytrust, there is a conflict of law between the states of Connecticut and Minnesota.

### A. Existence of a Conflict

█ The first issue, of course, is whether the statute applies to the oral agreement at issue in this case. "Credit agreement" is defined by the statute as an agreement "to lend or forebear repayment of money, goods, or things in action, to otherwise extend credit, or to make any other financial accommodation." Minn.Stat. § 513.33, subd. 1(1). The statute specifically provides that the following do not give rise to a claim that a new credit agreement is created: (1) the rendering of financial advice by a creditor to a debtor; (2) the consultation by a creditor with a debtor; or (3) the agreement by a creditor to take certain actions, such as entering into a new credit agreement, forebearing from exercising remedies under prior credit agreements, or extending installments due under prior credit agreements.

According to Pako, the only oral agreements at issue here concern Pako's right to compel Citytrust to assign the note, and subsequent oral agreements by Citytrust to reinstate the note following cancellation, and that none of these agreements fall within the purview of the Minnesota statute. The Court finds, however, that these arguments are contradicted by the broad language of the statute which reaches not only agreements to "lend or forebear repayment of money," but also any other "financial accommodation." The linchpin of plaintiff's suit is the alleged oral agreement giving Pako the right to compel assignment of the demand note. Clearly, this agreement is alleged as a condition attached to the underlying agreement with Citytrust to "lend Pako money," and thus was, in effect, an oral aspect of the underlying credit agreement. As such, the Court finds that it was covered by the credit agreement statute of frauds, and was required by that statute to be in writing. The Court further finds that the alleged assignment agreement was a "finan-

---

**3.** Minn.Stat. § 513.33 was enacted effective May 29, 1985. Laws 1985 Ch. 245 § 2 provides that the section applies to "all actions commencing after May 29, 1985, that arise out of credit agreements or relationships relating to credit agreements."

cial accommodation" within the meaning of the statute. The Court therefore concludes that if Minnesota law applies to this action, the Minnesota statute of frauds bars Pako's claim.

### B. Choice of Law

■ Having decided that the Minnesota statute of frauds covers the transaction at issue in this case, the Court finds that there is a conflict of law and must determine whether the law of Minnesota or that of Connecticut will apply. Pako claims that the underlying credit agreement specifies that Connecticut law will govern their transaction, and argues that Minnesota defers to such contractual choice of law provisions. *Held v. Mitsubishi Aircraft International Inc.*, 672 F.Supp. 369, 374 (D.Minn.1987).

### 1. *The Restatement Analysis*

While it is clear that in general Minnesota courts defer to contractual choices of law, whether they would do so where the Minnesota statute of frauds would otherwise apply is by no means certain. The applicability of a statute of frauds in a choice of law dispute is discussed at length in the Restatement (Second) of Conflicts of Law § 187. The Restatement provides:

The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of the state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rules of section 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

In this case, subsection (2) of section 187 applies because the statute of frauds is an issue of contract formality which is not one which the parties could have "resolved by an explicit provision in their agreement." This is so because a person cannot "dispense with formal requirements, such as that of a writing, by agreeing with the other party that the contract shall be binding without them." Restatement (Second) Conflict of Laws § 187, Comment d. Further, as discussed below, the Court finds that both Connecticut and Minnesota have a "substantial relationship to the parties or the transaction" and that there would be a reasonable basis for the choice of either state's law, and concludes that subsection (a) of Restatement 187 is therefore not applicable. Thus, under the Restatement, the parties' chosen law, that of Connecticut, will apply in this case unless the Court finds pursuant to subsection (b) that (1) Minnesota law would apply in the absence of the parties' choice, (2) Minnesota is determined to have a "materially greater interest" at stake than Connecticut, and (3) application of Connecticut law would be "contrary to a fundamental policy" of Minnesota.[4]

### a. The Choice–Influencing Considerations

Under the Restatement, therefore, the first issue which must be determined is whether under Minnesota's choice of law principles, Minnesota law would govern this transaction in the absence of the parties' choice of law. The Minnesota Supreme Court in *Milkovich v. Saari*, 295 Minn. 155, 203 N.W.2d 408 (1973) adopted a

---

**4.** Minnesota's choice of law test thus overlaps with the Restatement analysis in that both tests examine whether application of the chosen law would violate one of the possible forum states'

significant governmental interests. *See* R. Leflar, L. McDougal, R. Felix, *American Conflicts Law* (4th ed. 1986) § 106.

multi-factor methodology for determining the law applicable in a case having multi-state contacts. Under this methodology, the Court considers the following "choice-influencing considerations":

(a) predictability of results;

(b) maintenance of interstate and international order;

(c) simplification of the judicial task;

(d) advancement of the forum's governmental interest; and

(e) application of the better rule of law.

*Id.* 203 N.W.2d at 412.

The Minnesota Supreme Court has not yet been asked to apply these choice-influencing considerations to the issue of whether to apply a Minnesota statute of frauds over a contrary foreign state law. A few other courts, however, have considered the question and reached conflicting conclusions. In *Bushkin Associates Inc. v. Raytheon Co.*, 393 Mass. 622, 473 N.E.2d 662, 670 n. 7 (1985) the Supreme Judicial Court of Massachusetts applied the choice-influencing factors to the issue of whether a New York statute of frauds which would bar an oral "finder's fee" agreement between a New York investment banker and a Massachusetts corporation should be applied rather than a Massachusetts provision which would not bar such an agreement.[5]

The court began by comparing the competing interests of the forums, Massachusetts and New York. New York's interest, according to the court, was to effectuate the state's policy that promises be proved by written documents. Massachusetts, in contrast, preferred to permit a trier of fact to resolve conflicts in testimony concerning the existence of such an agreement. The court found that these competing interests were "balanced" and that the governmental interest factor pointed toward neither state. *Id.* 473 N.E.2d at 670.

The court then turned to the question of the justified expectations of the parties, an issue encompassed by the Leflar "predict-ability of results" factor. The court held that since the parties "expected that any oral agreement would be enforced," this factor militated in favor of Massachusetts law. *Id.* at 671. According to the court, where relevant contacts and considerations are "balanced, or nearly so, we are inclined to resolve the choice by choosing that law 'which would carry out .and validate the transaction in accordance with intention, in preference to a law that would tend to defeat it.... In this case the law that will validate the agreement, if indeed there was an agreement, is that of Massachusetts."[6] *Id.* The court held that Massachusetts law should govern the agreement. *Id.*

In *Intercontinental Planning, Ltd. v. Daystrom*, 24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969), the New York Court of Appeals was asked to decide whether the New York statute of frauds applied in a case brought by a New York business broker against a New Jersey and a foreign company based on an oral "finders fee" agreement. The New York statute of frauds would bar recovery on such an agreement, while the New Jersey statute would permit it. While the opinion does not precisely track each of Professor Leflar's five choice-influencing considerations, the New York Court of Appeals applied an analysis focusing on which state has the paramount interest in application of its law, eschewing a mechanistic analysis of where the contract was made and was to be performed or whether the statute of frauds was substantive or procedural. *Id.* 300 N.Y.S.2d at 822–23, 248 N.E.2d at 581–82. The court found that New York had an interest in application of its statute to protect foreign companies doing business in New York with New York brokers, while New Jersey's interest in applying its statute of frauds was not as compelling. The New Jersey statute of frauds was not specific to brokerage or finders fee arrangements but rather had a general purpose of preventing perjury and protecting parties

---

5. The decision was reached upon certified questions by the United States Court of Appeals for the First Circuit.

6. The Court also found that uniformity of result, maintenance of interstate order and simplification of the judicial task pointed toward neither state. *Id.* 473 N.E.2d at 670.

sued for alleged promises informally made. *Id.* at 824, 248 N.E.2d at 583. The court found that the policy of preventing perjury was essentially one of regulating the administration of justice in the courts of New Jersey and was inapplicable in an action brought in another state. According to the court, New Jersey "has no interest in protecting the New York courts from perjury." *Id.* The court further found that New Jersey had no interest in application of its more lenient statute of frauds in that case because to do so would subject the New Jersey company to liability whereas the New York statute would supply a defense.[7] The court therefore upheld the lower court's application of the New York statute of frauds. *Id.* at 825, 248 N.E.2d at 584.

In light of the above cases, the Court will now examine each of the *Milkovich* "choice-influencing considerations" to determine the first prong of the Restatement analysis, *i.e.*, whether Minnesota law would govern in the absence of an effective choice of law.

### (i) *Maintenance of Interstate and International Order*

Under Minnesota law, this factor looks at whether the forum state has "a substantial connection with the facts and issues involved." *Milkovich*, 203 N.W.2d at 417; *Standal v. Armstrong Cork Co.*, 356 N.W.2d 380, 381 (Minn.Ct.App.1984). Pako stresses that Citytrust is a Connecticut bank and that the loan was paid in Connecticut. Citytrust points to the fact that Pako and two of the secured lenders reside in Minnesota, as well as the fact that the alleged oral contract was negotiated in Minnesota. The Court finds that both Connecticut and Minnesota have "a substantial connection with the facts and issues involved," and concludes that this factor is not determinative of the choice of law question in this case.

### (ii) *Simplification of the Judicial Task*

This factor examines whether the Court will have difficulty applying the chosen law over that of Minnesota. *Hime v. State Farm Insurance Co.*, 284 N.W.2d 829, 833 (Minn.1979). The Court would have no difficulty in applying Connecticut law in this case, and this factor is therefore not determinative.

### (iii) *Advancement of the Forum's Governmental Interest*

The Court finds that Minnesota courts would, as in *Daystrom,* hold that Minnesota's interest in applying its statute of frauds in this case outweighs any competing interest of Connecticut. To give effect to the Minnesota Credit Agreement Statute of Frauds would effectuate the state's purpose in protecting lenders doing business in Minnesota from credit agreement claims based on oral representations. Moreover, as the court held in *Daystrom,* to the extent that the Connecticut statute of frauds encompasses Connecticut's policies toward the administration of justice, those policies are inapplicable in an action tried in Minnesota. The Court concludes that in this case the *Milkovich* governmental interests factor weighs in favor of applying Minnesota law.[8]

### (iv) *Predictability of Results*

This factor considers the justified expectations of the parties to the transaction.

---

7. The United States District Court for the Northern District of California also applied the New York statute of frauds over a contrary California provision, applying the "interest analysis" test used by the California Supreme court. *Denny v. American Tobacco Co.*, 308 F.Supp. 219 (N.D.Cal.1970). Three decisions applying the "most significant relationship" test rejected the New York statute of frauds. *See Havenfield Corp. v. H & R Block Inc.*, 509 F.2d 1263 (8th Cir.), *cert. denied*, 421 U.S. 999, 95 S.Ct. 2395, 44 L.Ed.2d 665 (1975) (Missouri law); *Ehrman v. Cook Electric Co.*, 468 F.Supp. 98 (N.D.Ill.1979); *Edwin F. Armstrong & Co. v. Ben Pearson Inc.*, 294 F.Supp. 163 (E.D.Ark.1967), *aff'd sub nom.*

*Leisure Group Inc. v. Edwin F. Armstrong & Co.*, 404 F.2d 610 (8th Cir.1968).

8. The Court notes that the Restatement indicates that a state's interest in the application of its statute of frauds will not "usually" be sufficiently important to overcome a party's choice of law. Restatement (Second) Conflict of Law § 187, Comment d, Comment g. Here, however, the Court is concerned, not with a generally-worded statute of frauds, but with a statute which the Court has found was specifically aimed at the type of transaction at issue here, one involving agreements to extend credit.

*Hime v. State Farm Insurance Co.,* 284 N.W.2d 829, 833 (Minn.1979); *cert. denied,* 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980).

The Court disagrees with the *Bushkin* court and finds that Minnesota's interest in the application of its statute of frauds in transactions of this sort is sufficient to outweigh whatever expectations the parties may have had regarding the applicability of Connecticut law or the enforceability of their oral agreement. The Court notes that this is not a case where the parties had a reasonable expectation that a substantive provision of their contract would be governed by a particular state law, but rather concerns an issue of contract formality. In such a situation, the parties' choice of law is not determinative. As the Restatement provides:

> Fulfillment of the parties' expectations is not the only value in contract law; regard must also be had for state interests and state regulation.

Restatement (Second) Conflict of Laws § 187, Comment g, *quoted with approval in Modern Computer Systems v. Modern Bank Systems,* 871 F.2d 734, 741 (8th Cir. 1989) (Heaney, J., dissenting). *See also* Restatement § 187, Comment d (parties cannot by agreement dispense with formal requirements).

### (v) *Application of the Better Rule of Law*

■ Because the Court finds that Minnesota's interest in application of its statute of frauds in this case is sufficient to decide the choice of law issue, it is not necessary to examine this factor. The Court is called upon to decide which is the better rule of law "only when other choice-influencing considerations leave the choice

of law uncertain." *Myers v. Government Employees Insurance Co.,* 302 Minn. 359, 225 N.W.2d 238, 244 (1974).

Thus, the Court concludes that under *Milkovich,* Minnesota law would apply in this case in the absence of a conflicting contractual choice of law. The Court further finds for the reasons discussed above that Minnesota has a materially greater interest in application of its statute of frauds than Connecticut and that the policy underlying the statute is sufficiently "fundamental" to overcome the choice of law provision contained in the credit agreement. *See Daystrom, supra.*[9] The Court concludes that Minn.Stat. § 513.33 applies in this case, and as discussed above, precludes enforcement of the alleged oral agreements between Pako and Citytrust.

### C. Estoppel

Pako contends that even if the Minnesota credit agreement statute of frauds applies, the oral agreements are nevertheless enforceable under the doctrines of either equitable or promissory estoppel.[10]

■ In *Del Hayes & Sons Inc. v. Mitchell,* 304 Minn. 275, 230 N.W.2d 588 (1975), the Minnesota Supreme Court acknowledged two views of promissory estoppel. Under the Restatement rule, promissory estoppel defeats a statute of frauds only when the promise relied upon is a promise to reduce the oral contract to writing. *Id.* 230 N.W.2d at 594. Restatement, Contracts § 178, comment f. Clearly, under this interpretation, Pako's alleged oral agreement would not survive the statute of frauds because Pako does not allege that Citytrust agreed to reduce the contract to writing. Other courts have simply rejected

---

**9.** *Modern Computer Systems v. Modern Banking Systems,* 871 F.2d 734 (8th Cir.1989) is not contrary. In *Modern Computer Systems,* the court held that Minnesota's interest in application of the Minnesota Franchise Act was not sufficient to overcome the party's choice of Nebraska law. Here, however, the issue is the application of the Minnesota statute of frauds, a matter of contract formality not determinable solely by reference to a choice of law provision. Restatement (Second) Conflict of Laws § 187, Comment d. *See* discussion, *supra.*

**10.** Pako also claims without supporting argument that the doctrine of performance takes the oral agreement out of the statute of frauds. Since this argument, however, is not supported by Pako, the Court will not discuss it further except to note that that doctrine does not apply to actions at law for money damages. *In re Estate of Hallock,* 221 Minn. 30, 20 N.W.2d 884, 885 (1945); *Becker v. First American State Bank,* 420 N.W.2d 239, 241 (Minn.Ct.App.1988).

the view that promissory estoppel can remove an oral contract from the statute of frauds. *See Del Hayes*, 230 N.W.2d at 594 n. 9 (citing cases denying estoppel). According to the court, the jurisdictions which adopt a restrictive view of promissory estoppel do so because "a promissory estoppel exception would likely render the statute of frauds nugatory." *Id.* The court went on to note that "there is always some degree of reliance on an oral contract." *Id.*

The court also outlined a less restrictive view which would permit promissory estoppel "where the detrimental reliance is of such a character and magnitude that refusal to enforce the contract would permit one party to perpetrate a fraud." *Id.* 230 N.W.2d at 594. The court noted, however, that "a mere refusal to perform an oral agreement, unaccompanied by unconscionable conduct, however, is not such a fraud as will justify disregarding the statute." *Id., citing* 3 Williston, *Contracts* (3d ed.) § 533(A).

The Court finds that promissory estoppel is not available to Pako to circumvent the Minnesota credit agreement statute of frauds. Pako alleges nothing more than a refusal on the part of Citytrust to perform an oral agreement. Pako alleges no "unconscionable conduct" on the part of Citytrust, nor anything remotely resembling fraud.

■ Nor does the Court find equitable estoppel to be appropriate in this case. As is promissory estoppel, equitable estoppel is "akin to fraud." *Del Hayes*, 230 N.W.2d at 595. In *Sacred Heart Farmers Co-op Elevator v. Johnson*, 305 Minn. 324, 232 N.W.2d 921 (1975), the Minnesota Supreme Court refused to apply the principle of equitable estoppel to circumvent the Minnesota statute of frauds where it found defendant's actions were not "so tainted with unfair dealing or deception as to approach the level of fraud and preclude him in equity from invoking the statute of frauds." *Id.* 232 N.W.2d at 923. The

11. Because the Court finds that Pako's claims are barred by its failure to disclose them in the bankruptcy proceeding, as well as by the Minnesota Credit Agreement Statute of Frauds, the

court found no evidence that defendant was "seeking to deceive, defraud, or otherwise take unfair advantage of plaintiff by the oral contract." *Id.* The court found that to apply the principle of equitable estoppel in that case would "render meaningless the statute of frauds." *Id.* Here, Pako has not alleged any "unfair dealing or deception" which provided Citytrust with any "unfair advantage." The Court finds that there is no basis for application of the doctrine of equitable estoppel in this case to permit Pako to circumvent the Minnesota credit agreement statute of frauds. *See Fronning v. Blume*, 429 N.W.2d 310, 314 (Minn.Ct.App.1988), *rev. denied,* (refusing to apply doctrine of equitable estoppel to overcome Minn.Stat. § 513.33).[11]

## CONCLUSION

Accordingly, based on the foregoing, and upon all the files, records and proceedings in this case,

IT IS ORDERED that:

1. defendant's motion for summary judgment on all claims is granted; and

2. the claims against Citytrust are dismissed.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Court need not and does not address Citytrust's remaining arguments in support of summary judgment.