674 A.2d 73

**WINMARK LIMITED PARTNERSHIP, et al.**

v.

**MILES & STOCKBRIDGE, et al.**

No. 1010, September Term, 1995.

Court of Special Appeals of Maryland.

April 1, 1996.

Steven B. Preller, Woodstock, for appellants.

Paul W. Spence (Spence, Kohler, Christie & Pulver, P.A., Towson, John E. Sandbower, III and Sandbower & Gabler, P.A., Baltimore, on the brief), for appellees.

Argued before DAVIS, MURPHY and HOLLANDER, JJ.

DAVIS, Judge.

This is an appeal from an April 27, 1995 Memorandum Opinion and Order of the Circuit Court for Baltimore City (Heller, J.) granting a motion to dismiss or, in the alternative, a motion for summary judgment. Although multiple questions

are presented for our review on this appeal, we need only address one issue, which we restate as follows:

Did the circuit court err in granting summary judgment on the ground that appellants' professional malpractice claim against appellees is barred under the doctrine of judicial estoppel?

We respond to this question in the negative, and therefore, affirm the grant of summary judgment.[1]

## FACTS

This appeal involves a borrower's claim of legal malpractice resulting from a law firm's dual representation of the borrower and lender during loan restructuring or "workout" negotiations for two commercial loans. Appellants are WinMark Limited Partnership (WinMark), Jay A. Winer (Winer), and Mark Sapperstein (Sapperstein). Winer and Sapperstein are WinMark's general partners. Appellees are the law firm of Miles & Stockbridge (firm) and two of the firm's attorneys and principals, Richard E. Levine (Levine) and Jeffrey H. Seibert (Seibert). On September 7, 1994, appellants filed in the Circuit Court for Baltimore City a complaint against appellees for legal malpractice. The complaint contains two counts:

---

1.  The other questions presented on this appeal are restated as follows:

    I.   Did the circuit court err in granting summary judgment based on the language of a "General Release"?

    II.  Did the circuit court err in dismissing appellants' punitive damages claim on the ground that appellants' allegations were insufficient for such a claim?

    III. May this Court affirm the circuit court on the ground that appellants' professional malpractice claims are barred by appellants' prior consent?

    IV.  May this Court affirm the circuit court's grant of summary judgment on the ground that appellants failed to allege in their complaint for professional malpractice sufficient facts demonstrating a causal connection between the alleged acts of misconduct by appellees and any claimed damages?

    Because we hold that the circuit court properly granted summary judgment based on the doctrine of judicial estoppel (as we shall explain fully below), we need not address the merits of these questions, and express no opinion on the circuit court's determinations regarding them.

Count I, for professional negligence, and Count II, for breach of contract. As the essential facts are not really in dispute, the following factual recitation is taken from appellants' complaint.

WinMark was formed in 1987 for the purpose of developing and managing two office buildings on two adjoining parcels of land—the "front" parcel and the "back" parcel—in Odenton, Maryland. In June 1988, WinMark borrowed $2,070,000 from Sovran Bank (bank)[2] for construction of an office building on the front parcel (the construction loan). The building, the front parcel, and an assignment of rents were the security for the construction loan. In addition, Winer and Sapperstein personally guaranteed payment of the loan.

In May 1990, in a separate transaction, WinMark borrowed $300,000 from the bank, secured by the undeveloped back parcel (the land loan). The maturity date for the land loan was May 17, 1990. The bank, however, extended the maturity date to November 16, 1991. Winer and Sapperstein were personal guarantors of the land loan as well. By a waiver dated May 15, 1990, WinMark consented to the firm representing both WinMark and the bank for the limited purpose of closing the land loan (after WinMark and the bank had already reached an agreement to all basic terms of the land loan). The waiver provided that, in the event of a default, the bank shall have the right to retain the firm in proceedings against WinMark.

In the fall of 1991, with the November 16, 1991 land loan maturity date approaching, WinMark initiated "workout" negotiations with the bank. Because WinMark was unable to pay the land loan at maturity, it requested an extension of the maturity date. In addition, WinMark desired to restructure the construction loan to take advantage of lower interest rates and to alleviate concern over WinMark's continued ability to service the construction loan.

---

2.  Sovran Bank was later succeeded by NationsBank, N.A.

Notwithstanding that WinMark was unable to pay the land loan at maturity and had doubts over its ability to service the construction loan, the firm represented both WinMark and the bank during the workout negotiations. Furthermore, the firm and Levine rendered legal advice to Winer and Sapperstein regarding their potential liability as personal guarantors of the loans and as general partners of WinMark. According to appellants, the firm and Levine had a conflict because the interests of appellants and the bank were directly adverse to each other. Moreover, the firm and Levine never disclosed to appellants the possible effects of such conflict, including its affect on the firm's duty of loyalty and confidentiality. Nor did it obtain a written waiver of the conflict after making a full disclosure.

During the course of the workout negotiations, appellants supplied voluminous and detailed financial data at the bank's request. Specifically, on or about October 28, 1991, Winer supplied a personal financial statement (October statement) to the bank reflecting his net worth to be $2,538,000 as of September 30, 1991. The October statement included assets that Winer held jointly with his wife amounting to a value of approximately $500,000. On November 11, 1991, at the direction of the firm and Levine, Winer provided an updated financial statement (November statement) to the bank deleting those jointly held assets.

By letter dated November 13, 1991, the bank, represented by the firm, advised WinMark that, as a result of the November statement, WinMark's request for an extension on the land loan was denied. The bank also demanded payment by the November 16, 1991 maturity date. The bank further suggested that the November statement was not consistent with financial statements submitted in 1988 at the time the construction loan was made. Appellants contend that the bank viewed the financial statement problem as an event of default. According to appellants, however, the bank had always been aware that Winer held assets jointly with his wife. For example, prior to the settlement of the construction loan, Winer received $1,000,000 from the settlement of another

project. As the bank was aware, Winer began to convert this cash into various investments. The bank imposed no restriction on how these investments were to be held. In fact, Winer acquired two certificates of deposit from the bank, one of which was jointly held. Indeed, the applicable loan documents did not prevent Winer or any other guarantor from transferring assets to any other person.

At this point, appellants contend that their positions and that of the bank were directly adverse to each other. In fact, the disagreement regarding the financial statements eventually resulted in litigation between appellants and the bank. The firm, however, "incredibly" continued to represent both sides, rather than immediately withdraw its representation. "More importantly, [the firm] and Levine failed to investigate and properly advocate the issues surrounding the financial statements on behalf of the [appellants]. Infact [sic], the [appellants] aver that because of the conflict of interest of [the firm] in representing both the lender and borrower at this crucial stage, it was impossible for [the firm] to render independent, professional legal representation on behalf of both the [appellants], on one hand, and the Bank, on the other hand." According to appellants, it was imperative that the financial statement dispute be resolved promptly, because it affected the bank's willingness to extend the land loan and to restructure the construction loan.

Allegedly, the firm and Levine advised the bank that, if litigation ensued, it would discontinue representing appellants. As a result of this conflict, the firm and Levine never advised or recommended litigation alternatives to appellants as a means of resolving their dispute with the bank, such as obtaining declaratory relief on the issues of default or materiality with respect to the financial statements, or filing for Chapter 11 protection. "Ultimately, with other counsel representing the [appellants], these litigation alternatives resolved matters between [appellants] and the Bank."

Appellants point to a November 14, 1991 memorandum to file (memo) written by A. David Horseman, a vice president of

the bank, as evidence of the firm's inherent conflict of interest and of the firm's failure to provide adequate representation to appellants. The memo indicated that Horseman advised Winer by letter that all prior financial statements were incorrect because they included jointly held assets. In addition, the memo states that Levine contacted Horseman to ask about the bank's position, and to inform the bank that the firm would not represent appellants if the bank initiated adversarial proceedings against appellants. Moreover, the memo states that Levine instructed Winer to correct his financial statement, but that Winer "did not understand that the misrepresentation was a problem."

Appellants contend that, based on the contents of the memo, it is evident that Levine failed to advocate appellants' position that

(i) the financial statements neither aver nor deny that Winer is the sole owner of the assets listed, (ii) the Bank was aware when it extended the financing that some of Winer's assets were, and other assets might be, held by Winer jointly with his wife, (iii) the stocks were not acquired until after the loans were made, and the Bank was previously made aware of how these assets were held, (iv) there are no restrictions preventing Winer, as a guarantor, from transferring assets, (v) the Bank's Construction Loan was adequately collateralized, and (vi) because Winer continued to have significant other assets, even assuming, arguendo, that the financial statements submitted to the Bank in 1988 omitted to clarify jointly held assets, such omission does not constitute an event of default under the applicable loan documents and is not material.

Moreover, according to appellants, when a default under the land loan was imminent, the firm did not represent the bank exclusively pursuant to the May 15, 1990 waiver, but, instead, chose to continue representing both parties—even though the firm's loyalties clearly resided with the bank. "The failure by [the firm] and Levine to zealously represent the [appellants] is further evidenced by the fact that, subsequent to the Bank's November 13, 1991 letter advising [appellants] that the Land

Loan would not be extended, [the firm] and Levine continued to represent [appellants] but failed completely to take any meaningful action whatsoever." Essentially, appellants complain that the firm and Levine never advised of litigation alternatives, never advocated appellants' position with respect to the financial statements, never contacted appellants to develop a strategy or proposal for dealing with the bank, and never conducted meetings with the bank to attempt to resolve the issues. "Clearly, [appellants] were deprived of independent and zealous representation.... [Appellants] aver that if [appellees] had properly advocated and advanced their position regarding the financial statements, the [appellants] and the Bank would likely have been able to resolve matters amicably and quickly."

On November 16, 1991, the land loan matured without a resolution of many of the issues existing between appellants and the bank. During this time, the firm continued to represent both parties. After Winer told Levine in early December 1991 that it was improper for the firm to continue to represent both parties, the firm and Levine eventually withdrew their representation of appellants, but continued to represent the bank through Seibert.[3] According to appellants, appellees continued to represent the bank in the same matter without obtaining WinMark's consent. It is WinMark's position that the firm's right to represent the bank, as reserved in the May 15, 1990 waiver, was relinquished when the firm elected to represent both parties after a default became imminent.

"Represented by [the firm] and Seibert, the Bank became aggressive and hostile towards the [appellants]." The bank refused to consider any refinancing of the land loan and refused to restructure the construction loan unless certain conditions were met. The conditions were that WinMark

---

**3.** This allegation conflicts with Winer's affidavit from the injunction proceedings in the Circuit Court for Anne Arundel County (discussed below). According to Winer's affidavit, which is part of the record on this appeal, the firm acknowledged in *November* 1991 that appellants should retain independent counsel, and referred appellants to the law firm of Whiteford, Taylor & Preston.

immediately pay off the land loan, pledge an additional $500,-
000 of collateral, establish a $200,000 cash escrow account, and
sell the back parcel with the proceeds to be applied to the
construction loan. During this time, appellants remained cur-
rent under the construction loan. "Given the circumstances, it
is evident that the Bank, represented by the [appellees], was
using the unresolved issue concerning the financial statements
to extract substantial payments and concessions from the
[appellants] on behalf of the Bank as part of a scheme to
intimidate the [appellants]."

On January 8, 1992, the bank allegedly offered appellants
two alternative proposals to resolve all outstanding issues
regarding the loans. In general, these proposals were: (1) the
bank would restructure the construction loan at a market
interest rate and extend the maturity for two years in ex-
change for $1,000,000 in additional collateral plus a lien on the
back parcel; or (2) the bank would hold WinMark to the
existing high-interest construction loan, notwithstanding the
bank's claim of default relating to the financial statements, in
consideration of payment of the $300,000 land loan.[4]

On January 24, 1992, WinMark accepted the second alterna-
tive plan, thereby apparently resolving all issues between the
parties. Three days later, notwithstanding WinMark's accep-
tance of the bank's proposal and its compliance with the terms
thereof (including paying off the $300,000 land loan), the bank,
with appellees as counsel, notified WinMark that it considered
WinMark to be in default of the construction loan by reason of
the financial statement problem. The bank further informed
WinMark that immediate legal action would be commenced
unless appellants made certain other concessions.

As a result of the bank's failure to honor the terms of the
settlement, appellants sought a preliminary injunction against
the bank in the Circuit Court for Anne Arundel County. By
order dated February 26, 1992, the circuit court enjoined the

---

4. According to Winer's affidavit (noted above), these alternative propos-
als were originally presented to appellants and their new counsel
during a meeting on December 17, 1991.

bank from exercising its default remedies under the construction loan. Subsequent to this litigation, the bank claimed that it was entitled to attorney's fees in excess of $200,000. WinMark denied that the bank was entitled to such fees in connection with WinMark's successful litigation.

The disagreement over the attorney's fees ultimately prevented the bank and WinMark from agreeing on the terms of a refinancing arrangement for the construction loan. Consequently, on July 20, 1993, WinMark was forced to file Chapter 11 bankruptcy. On March 14, 1994, the bankruptcy court entered an order confirming WinMark's plan of reorganization. Under the terms of the reorganization plan, WinMark was required to pay the bank approximately $300,000 in settlement of late fees, default interest, attorney's fees and other charges.

Appellants allege that appellees' dual representation violated several rules of professional conduct. They charge that appellees never obtained appellants' consent for such dual representation, and were motivated by a desire to maximize firm revenues. Appellants further contend that the firm and Levine improperly used confidential information obtained from appellants in representing the bank against appellants. As a result of appellees' conduct, "the [appellants] were deprived of the right to zealous representation and confidential communications were compromised."

In Count I of their complaint (professional negligence), appellants repeated many of the above assertions and alleged that appellees' conduct caused the bank to seek additional concessions and collateral from appellants after the parties purportedly settled matters. In addition, appellants alleged that "[a]s a result of the negligent and malicious conduct of each of the [appellees], the [appellants] have suffered significant damages, including, without limitation, damages arising out of the legal proceedings which were required to remedy the harm caused by [appellees'] tortious conduct, as well as significant additional sums which were required to be paid to the Bank and others to remedy the harm caused by [appel-

lees]." Appellants demanded compensatory and punitive damages.

In Count II of their complaint (breach of contract), appellants alleged that appellees' foregoing acts of misconduct amounted to a breach of the contract between the parties and have caused appellants to "have suffered significant damages, including, without limitation, damages arising out of the legal proceedings which were required to remedy the harm caused by [appellees'] breach, as well as significant additional sums which were required to be paid to the Bank and others to remedy the harm caused by [appellees]." Appellants demanded compensatory damages for the alleged breach of contract.

In addition to the allegations contained in the complaint, the record reveals two other pertinent facts. One, the parties agree that, during the course of the bankruptcy proceedings, WinMark never listed its malpractice claim against appellees as an asset in its Disclosure Statement and schedules submitted under oath to the bankruptcy court. For example, on the personal property schedule, under the category "Other contingent and unliquidated claims of every nature," the word "None" appears. Thus, the bankruptcy court and the creditors were unaware that this potentially valid asset existed. Two, following the bankruptcy court's confirmation of the reorganization plan, each of appellants and the bank entered into a General Release, the pertinent provisions of which read:

> The term "Releasees" shall mean, individually and collectively, (i) the Lender, (ii) the Lender's predecessors, successors, subsidiaries, affiliates, assigns and parent corporations, (iii) the Lender's officers, managers, directors, shareholders, agents, attorneys, representatives and employees, but only in their respective capacities as such. . . .

> \*       \*       \*       \*       \*       \*

> 1. The Releasors hereby release and forever discharge the Releasees, jointly and severally, from, in respect of, or in relation to any and all manner of actions, causes of action, suits, . . . of any kind whatsoever. . . .

Appellees responded to appellants' complaint with a document styled as a "Motion to Dismiss." Appellees presented several arguments in support of their motion. Among them were the following: (1) appellants' claims are barred by the General Release; (2) appellants' claims are barred by judicial estoppel; (3) appellants' claims are barred by their prior consent to appellees' dual representation; (4) appellants failed to allege sufficient facts to support a demand for punitive damages; and (5) appellants failed to allege any facts demonstrating a causal connection between appellees' allegedly wrongful conduct and alleged damages.

On April 27, 1995, the circuit court issued a written Memorandum Opinion and Order granting the motion and entering judgment in appellees' favor. The circuit court's order was based on three grounds. First, the circuit court determined that, under the plain language of the General Release, appellants released appellees from all claims of liability. Second, the circuit court ruled that appellants' claim against appellees for professional malpractice was barred under the doctrine of judicial estoppel. In this regard, the circuit court reasoned that, because WinMark failed to disclose its claim against appellees in the schedules and statements filed with the bankruptcy court, appellants were estopped from asserting the claim in the current action. Third, the circuit court dismissed appellants' complaint with respect to punitive damages because it found no allegations giving rise to the standard of "actual malice." Finally, in concluding, the circuit court stated:

[A]lthough this Court finds no need to make a decision on [appellees'] contention that no act on their part caused any damages to [appellants], there is very little in the pleadings that indicate[s] any damage to [appellants] caused by the allegations in the Complaint. It is undisputed that the whole thrust of this Complaint is that [appellants] believe they did not receive zealous representation beginning mid-November, 1991. However, within three to four weeks they had already retained new counsel, at the request of the [appellees]. The decisions regarding litigation and bank-

ruptcy that they now indicate [appellees] should have brought to their attention were exercised by new counsel. In regard to the Land Loan, it is undisputed that the Bank called the Land Loan when it was due, and despite the advocacy of new counsel, the Bank ultimately decided on January 27, 1992 that it considered WinMark in default of the Construction Loan. It is difficult to discern what actions of the [appellees] harmed the [appellants] during that small window of time between mid-November and mid-December, 1991. However, the Court need not decide the damage issue in view of its other rulings.

(Footnote omitted). From this order, appellants appeal to this Court.

## DISCUSSION

### I

Before addressing the merits of this appeal, it is necessary to determine the exact nature of the circuit court's rulings contained in its written Memorandum Opinion and Order. As noted above, on this appeal, we only are concerned with the circuit court's determination with respect to the doctrine of judicial estoppel. This matter is not readily apparent, because the circuit court stated that it was granting both a motion to dismiss and/or a motion for summary judgment. Upon review of the Memorandum Opinion and Order, we hold that, when the circuit court ruled that appellants' claim for professional malpractice was barred under the doctrine of judicial estoppel, the circuit court granted summary judgment in appellees' favor. This is because the circuit court necessarily considered matters beyond the pleadings when it determined that appellees were entitled to judgment as a matter of law. *See Hrehorovich v. Harbor Hosp. Ctr.*, 93 Md.App. 772, 782–85, 614 A.2d 1021 (1992).

Thus, even though styled "Motion to Dismiss," appellees' motion sought summary judgment as a matter of law based on the doctrine of judicial estoppel because, under that theory, it was necessary for the circuit court to look beyond

the complaint. "If, on a motion to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 2–501...." MARYLAND RULE 2–322(c) (1996). Under MARYLAND RULE 2–501(a), a party is permitted to "file at any time a motion for summary judgment on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law." In reviewing a trial court's grant of summary judgment, an appellate court is required to determine whether the trial court's ruling was legally correct. *Nationwide Mut. Ins. Co. v. Scherr,* 101 Md.App. 690, 694, 647 A.2d 1297 (1994). This Court reviews the same material from the record and decides the same legal issues as the circuit court. *Id.* at 695, 614 A.2d 1021.

## II

■ The circuit court correctly granted summary judgment on the ground that appellants' professional malpractice claim against appellees is barred under the doctrine of judicial estoppel because appellants failed to disclose this claim on the schedules and the Disclosure Statement filed with the bankruptcy court.

The doctrine of judicial estoppel embodies the principle that a party should not be permitted to adopt or assume inconsistent positions during the course of litigation. In this State, the doctrine of judicial estoppel has not been the subject of extensive appellate court analysis. This is not to say, however, that Maryland courts have totally ignored the doctrine. The Court of Appeals, for example, long ago stated:

If parties in court were permitted to assume inconsistent positions in the trial of their causes, the usefulness of courts of justice would in most cases be paralyzed; the coercive process of the law, available only between those who consented to its exercise, could be set at naught by all. But the

rights of all men, honest and dishonest, are in the keeping of the courts, and consistency of proceeding is therefore required of all those who come or are brought before them. It may accordingly be laid down as a broad proposition that one who, without mistake induced by the opposite party, has taken a particular position deliberately in the course of litigation, must act consistently with it; one cannot play fast and loose.

*Kramer v. Globe Brewing Co.,* 175 Md. 461, 469, 2 A.2d 634 (1938) (quoting *Bigelow on Estoppel* (6th ed.) at 783, and citing *Ohio & Mississippi Railway Co. v. McCarthy,* 96 U.S. 258, 24 L.Ed. 693 (1878)). *See also Major v. First Va. Bank,* 97 Md.App. 520, 539, 631 A.2d 127 (1993) ("appellants ... are not playing so 'fast and loose' as to require the application of judicial estoppel.").

*Billman v. State Deposit Ins. Fund Corp.,* 86 Md.App. 1, 585 A.2d 238 (1991), is, perhaps, the best example of the application of the doctrine of judicial estoppel in Maryland. In *Billman,* appellees filed two lawsuits (the "first" and "second" suit), in which appellants were included among the defendants. *Id.* at 18–19, 585 A.2d 238. Subsequently, appellees sought to consolidate the cases pursuant to MARYLAND RULE 2–503. *Id.* at 19, 585 A.2d 238. Appellants strongly opposed the motion to consolidate, arguing that the two cases involved " 'entirely separate and discrete transactions' and that there were no common questions of fact or law." *Id.* Evidencing their vigorous opposition to consolidation was appellants' assertion that, in seeking consolidation, appellees were " 'attempting to pound square pegs in round holes.' " *Id.* Appellants successfully convinced the trial court not to consolidate the cases.

The first case went to trial, and the jury returned a verdict in favor of appellees. *Id.* at 20, 585 A.2d 238. In the second suit, the trial court entered a default judgment against appellants. *Id.* at 8, 20, 585 A.2d 238. On appeal from the default judgment, appellants argued, among other things, that the second case should have been dismissed under the doctrine of *res judicata* because the claims in the second case could have

been litigated in the first case. *Id.* at 20–21, 585 A.2d 238. After reciting the above passage from *Kramer,* we determined that appellants were estopped from relying on this argument in light of their having successfully convinced the trial court not to consolidate the second case with the first case. *Id.*

Although the aforementioned cases provide a basic understanding of the doctrine of judicial estoppel, those cases do not deal specifically with the operation of judicial estoppel under the facts of the instant case. The parties do not direct us to, nor have we found, any reported Maryland cases addressing the doctrine of judicial estoppel in the specific context of a party failing to disclose a claim in bankruptcy court proceedings, and then, subsequent to the bankruptcy proceedings, attempting to assert that claim anew. We shall examine cases from other jurisdictions addressing the issue under facts similar to the instant case.

The circuit court heavily relied on *Southmark Corp. v. Trotter, Smith & Jacobs,* 212 Ga.App. 454, 442 S.E.2d 265 (1994), in granting summary judgment in favor of appellees. The facts of *Southmark* are strikingly similar to the facts of the instant case. In *Southmark,* the trial court, in a legal malpractice action, granted the attorneys' motion for summary judgment based on the client's failure to identify its malpractice claim against the attorneys in the client's prior Chapter 11 bankruptcy proceeding. *Id.* at 266. The Court of Appeals of Georgia affirmed the grant of summary judgment. *Id.* at 267. In so doing, the court stated that the doctrine of judicial estoppel is designed to prevent the use of intentional self-contradiction as a means of obtaining an unfair advantage. *Id.* at 266–67 (quoting *Allen v. Zurich Ins. Co.,* 667 F.2d 1162, 1167 (4th Cir.1982)). Significantly, the court explained:

Compliance with disclosure requirements is essential to maintaining a bankruptcy case. In the light of the stringent disclosure requirements under Chapter 11, the failure to disclose such information is viewed as amounting to a denial that such claims exist. This de facto denial triggers the application of several types of issue preclusion to bar subsequent attempts to prosecute such actions.... there was no

reference to any claim against [the attorneys] and this failure to disclose precludes subsequent assertion of those claims.

*Id.* at 267 (citations omitted).

In addition to focusing on the importance of theChapter 11 disclosure requirements, the Georgia court stressed that the client "had knowledge of the claims against the [attorneys] prior to confirmation of [the client's] final plan of reorganization." *Id.* The underlying principle in *Southmark*, therefore, can be expressed as follows: Judicial estoppel bars a claimant from attempting to assert a cause of action against an opposing party in a court proceeding after having failed to disclose that claim in a prior bankruptcy proceeding in which the claimant was the debtor—such attempt being tantamount to the improper use of intentional self-contradiction as a means of obtaining an unfair advantage.

*Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414 (3d Cir.1988), is the seminal case on this subject.[5] This case involves the assertion of judicial estoppel as a defense by a party who was also a party in the prior bankruptcy proceeding. In this limited sense, *Oneida* is slightly different from *Southmark* and the instant case. In *Oneida,* the bankruptcy court confirmed the debtor's plan of reorganization. *Id.* at 415–16. Seven months later, the debtor sued its former bank (a creditor in the Chapter 11 bankruptcy proceedings) in New Jersey state court, alleging various causes of action, including breach of credit agreements and fraudulent misrepresentation. *Id.* at 416. These claims were not referred to in the debtor's plan of reorganization or in the bankruptcy court's confirmation order. *Id.* The bank removed the action to the U.S. District Court for the District of New Jersey, where the matter was dismissed based on "fundamental principles of preclusion." *Id.*

On appeal, the U.S. Court of Appeals for the Third Circuit affirmed the district court's dismissal. *Id.* at 420. In explain-

---

**5.** *Southmark* relied on this case. *Southmark,* 442 S.E.2d at 267.

ing its reasoning, the court initially stressed the utmost importance of full disclosure in bankruptcy proceedings. *Id.* at 417. In this regard, the court noted that various sections of the Bankruptcy Code require the debtor to disclose fully its assets and financial affairs. *Id.* (citing 11 U.S.C. §§ 521(1) & 1125 (1978)). Thus, according to the court:

> The preparing and filing of a disclosure statement is a critical step in the reorganization of a Chapter 11 debtor. One commentator, citing the relevant legislative history, labeled this duty as the pivotal concept in reorganization procedure under the Code. 5 Collier on Bankruptcy ¶ 1125.03 (15th ed. 1988).

> The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the [Bankruptcy] Code standard of "adequate information."

> \*   \*   \*   \*   \*   \*

> It has been specifically held that a debtor must disclose any litigation likely to arise in a non-bankruptcy contest.

> \*   \*   \*   \*   \*   \*

> Disclosure is important, in this case, not only to the bank as an adversary and as a creditor, but to the other creditors and to the bankruptcy court. Here, "the silence" in the Oneida bankruptcy record concerning this present claim, as they say in the vernacular, "is deafening."

*Id.* (citations omitted). In light of these principles, the federal court of appeals concluded that the debtor's failure to list its claim against the bank "worked in opposition to preservation of the integrity of the system which the doctrine of judicial estoppel seeks to protect." *Id.* at 419.[6]

---

**6.** A vehement dissent to the court's holding was filed. *Oneida,* 848 F.2d at 420. The dissent argued that application of judicial estoppel is contrary to the Bankruptcy Code's disclosure provisions, which are designed to protect creditors from a debtor that hides assets. *Id.* at

Along similar lines, the bankruptcy court in *In re H.R.P. Auto Ctr.*, 130 B.R. 247, 254 (Bankr.N.D.Ohio 1991), after citing *Oneida*, held:

> Debtor's pursuit of the alleged overpayment at this late date is inconsistent with the position taken during reorganization. Omission of the potential claim from the petition, schedules and disclosure statement as well as its prosecution of the State's claim precludes assertion of the amended counterclaim. Debtor was aware of the potential claim during the pendency of reorganization but has failed to provide any cogent reason for its omission. [The debtor's] failure to list this potential asset and subsequent attempt to allege the overpayment defensively in response to the State's motion to dismiss or convert, compromises the integrity of the reorganization process.

*In re Galerie Des Monnaies of Geneva, Ltd*, 62 B.R. 224 (S.D.N.Y.1986), is another example in this line of cases. There, a Chapter 11 debtor filed a disclosure statement in which it declared that the debtor did " 'not believe any preferences or fraudulent transfers have occurred.' " *Id.* at 225. The debtor's reorganization plan provided for the debtor to receive the benefit of any preferential claims. *Id.* On the day that the bankruptcy court confirmed the debtor's reorganization plan, the debtor filed an adversary proceeding against a bank to collect alleged preferential transfers. *Id.* The bankruptcy court dismissed the debtor's claim against the bank. *Id.* On appeal, the U.S. District Court for the Southern District of New York affirmed, stating:

> On the undisputed facts, [the debtor] inaccurately asserted to its creditors and the bankruptcy court that it knew of no preferential transfers. Even if that statement was true when made, it was certainly in error at the time of the plan's approval. On the basis of [the debtor's] representa-

---

422. According to the dissent, precluding the debtor from prosecuting its claim against the bank penalizes the creditors by placing a potentially valuable asset of the estate out of their reach, and rewards the bank's allegedly improper behavior. *Id.* at 422-23.

tions the creditors and the court approved a reorganization plan which allowed [the debtor] to receive the benefit of recouped preferential transfers. The very next day [the debtor] sought to recover alleged preferential transfers from the bank. " 'Judicial estoppel' is invoked in these circumstances to prevent the party from 'playing fast and loose' with the courts, and to protect the essential integrity of the judicial process...." *Allen v. Zurich Insurance Co.,* 667 F.2d 1162, 1166 (4th Cir.1982). To permit [the debtor] this "about face" move would seriously impair the integrity of the judicial process.

*Id.* at 225–26. Significantly, the court recognized the "critical" function that disclosure statements serve in the course of voluntary reorganization. *Id.* at 226.

*Pako Corp. v. Citytrust,* 109 B.R. 368 (D.Minn.1989), is another case worthy of analysis because it is similar to *Southmark* in that it involves the defense of judicial estoppel asserted by a party that was not also a party in the prior bankruptcy proceedings. *Id.* at 376 n. 2. In *Pako,* a Chapter 11 debtor failed to disclose in the bankruptcy proceedings its potential claims against a bank arising out of the cancellation of a note and subordination agreement. *Id.* at 371. Over a year after the debtor's plan of reorganization was confirmed, the debtor sued the bank in federal district court for breach of contract, misrepresentation, and various other claims. *Id.*

In response, the bank filed a motion for summary judgment. *Id.* Therein, the bank argued, among other things, that the debtor's suit was barred by judicial estoppel. *Id.* at 372. The district court agreed with the bank, holding that the debtor's failure to disclose its claims against the bank during the bankruptcy proceedings was a "knowing misrepresentation." *Id.* at 376. Because there was evidence that the debtor believed all along that it had been " 'wronged' " and " 'deceived and misled' " by the bank, the district court rejected the debtor's claim that it was unaware of its potential claims against the bank. *Id.* at 376–77. Accordingly, the court determined that the "application of judicial estoppel is necessary to prevent [the debtor] from playing 'fast and loose' with

the Court and to protect the integrity of the bankruptcy process." *Id.* at 377. As in the cases above, *Pako* recognized the importance of a debtor's duty of disclosure in bankruptcy proceedings. *Id.* at 372 (citing *Oneida* ).

The foregoing cases are by no means the only cases holding that a Chapter 11 debtor's failure to disclose a claim during bankruptcy proceedings judicially estops the debtor from subsequently asserting that claim. *See, e.g., In re Hoffman,* 99 B.R. 929, 935–36 (N.D.Iowa 1989) (Because Chapter 11 debtor failed to disclose its claim against a creditor, the debtor was judicially estopped from subsequently asserting that claim); *In re Louden,* 106 B.R. 109, 112 (Bankr.E.D.Ky.1989) (recognizing the importance of a debtor's duty of disclosure in bankruptcy proceedings, the court held that the debtors were judicially estopped, by their failure to schedule their cause of action against a bank, from subsequently asserting the same claim). In addition, it has been recognized that judicial estoppel is particularly applicable where sworn statements are involved. *See Konstantinidis v. Chen,* 626 F.2d 933, 937 (D.C.Cir.1980) (judicial estoppel upholds the public policy exalting the sanctity of the oath); *In re Phillips,* 124 B.R. 712, 720 (Bankr.W.D.Tex.1991) (judicial estoppel "upholds the public policy which exalts the sanctity of oath."); *In re Galerie Des Monnaies of Geneva, Ltd.,* 55 B.R. 253, 260 (Bankr. S.D.N.Y.1985) (judicial estoppel rests on the public policy exalting the sanctity of the oath).

We acknowledge that not all of these cases are precisely on point with the instant case. Indeed, certain cases may be distinguished from the instant case on one basis or another. We certainly recognize that there are cases that reach a different result, often because of the element of intent to assume a contradictory position. *Chesapeake Fiber Packaging Corp. v. Sebro Packaging Corp.,* 143 B.R. 360, 373 (D.Md. 1992) (distinguishing *Oneida,* the court held that a bankruptcy debtor in possession is not estopped from claiming title to a patent application as a result of failing to list it on the schedule of assets); *In re MAI Systems Corp.,* 178 B.R. 50, 53–54 (Bankr.D.Del.1995) (distinguishing *Oneida,* the court

held that judicial estoppel did not bar a Chapter 11 debtor's previously undisclosed breach of contract claim, *inter alia,* because the debtor's prior silence could not be construed as assuming a position inconsistent with its pre-confirmation position); *In re Envirodyne Indus., Inc.,* 183 B.R. 812, 824–26 (Bankr.N.D.Ill.1995) (debtor's failure to disclose its counter-claim against a creditor did not judicially estop the debtor from later asserting that claim because the creditor failed to demonstrate that the debtor intentionally assumed a contra-dictory position). The cases upholding judicial estoppel, how-ever, nonetheless are instructive and support our analysis because they are representative of judicial estoppel cases involving a debtor's failure to disclose a claim in a prior bankruptcy proceeding. Moreover, these cases highlight im-portant principles, most notably, the critical nature of a bank-ruptcy debtor's duty to make a full disclosure. In our view, these cases are quite persuasive. Furthermore, we find the teachings of these cases to be consistent with the basic principles of Maryland case law on judicial estoppel enunciated above.

■ In light of the foregoing cases, we hold that the circuit court correctly determined that appellants were judicially estopped from asserting their malpractice claim against appel-lees. There can be no doubt regarding the importance of the debtor's disclosure in bankruptcy proceedings. Because of the critical role that disclosure of claims plays in a Chapter 11 reorganization proceeding, appellants' attempt to assert subse-quently a claim that was omitted from the Disclosure State-ment and schedules submitted to the bankruptcy court is tantamount to intentionally adopting contradictory positions and improperly playing "fast and loose" with both the bank-ruptcy court and the circuit court.

Appellants claim that because their omission was due to innocent inadvertence and was not intentionally calculated to deceive, mislead, or unduly take advantage of appellees or the courts, application of the doctrine of judicial estoppel is with-out merit. To be sure, cases outside of the unique context of a debtor's nondisclosure of a claim in bankruptcy support the

proposition that the application of judicial estoppel depends on the deliberate manner in which a party assumes two inconsistent positions. *See, e.g., John S. Clark Co. v. Faggert & Frieden, P.C.,* 65 F.3d 26, 29 (4th Cir.1995) (judicial estoppel should not be applied when a party's prior position was based on mistake or inadvertence); *Levinson v. U.S.,* 969 F.2d 260, 264 (7th Cir.1992) (judicial estoppel protects courts from being "manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories."); *Tenneco Chem., Inc. v. William T. Burnett & Co.,* 691 F.2d 658, 665 (4th Cir.1982) (the determinative factor under judicial estoppel is whether the party intentionally misled the court to gain an unfair advantage); *Forty–Eight Insulations, Inc. v. Aetna Casualty & Sur. Co.,* 162 B.R. 143, 147 (N.D.Ill.1993) (judicial estoppel must be applied with caution to protect the integrity of the court system from cynical gamesmanship); *In re Hotel Syracuse, Inc.,* 155 B.R. 824, 837 (Bankr.N.D.N.Y.1993) (an element of the doctrine of judicial estoppel is that the party intended to mislead the court and thereby obtain an unfair advantage).  For two reasons, however, we reject appellants' argument.

First, as alluded to above, a fair reading of those cases dealing specifically with a debtor failing to disclose its claim during bankruptcy proceedings leads us to conclude that the courts implicitly, if not expressly, consider a debtor's subsequent attempt to assert the previously undisclosed claim as tantamount to playing "fast and loose" with the court system. Equating such an attempt with playing "fast and loose" makes abundant sense in light of the overriding importance attributed to a debtor's duty of disclosure of assets and claims during Chapter 11 reorganization.  Stated differently, we agree with *Oneida* that a debtor's silence, under these circumstances, is deafening.  It must be remembered that appellants' disclosure papers were submitted under oath.  In our view, therefore, the general judicial estoppel cases presented in the immediately preceding paragraph are not inconsistent with the specific nondisclosure cases detailed above.

Second, in light of the record in this case, appellants' excuse of inadvertence rings hollow. From the beginning, appellants asserted and believed that appellees' actions were a substantial cause forcing WinMark into bankruptcy. In the Anne Arundel County litigation—which occurred well before the bankruptcy proceedings—this is essentially what appellants alleged. The Anne Arundel County complaint contains multiple references both to appellants' displeasure with the manner in which appellees represented them and to the manner in which appellees allegedly aided the bank in harming appellants. In this latter regard, as the circuit court noted, an excerpt of Count I (misrepresentation) of that complaint reads, "Aided by its counsel, [appellees], [the bank] falsely represented to [appellants] the bank's intention to permit Winmark to perform under the construction loan contract. . . ." In addition, appellant Winer's affidavit filed in the Anne Arundel County litigation alleges that appellees *"purported* to represent Winmark and me individually in those same dealings and transactions." (Emphasis added). Similar allegations are peppered throughout the affidavit. Moreover, paragraph 14 of the affidavit lays to rest any doubts regarding whether appellants were aware of their claim against appellees. That paragraph reads:

In November 1991, Miles & Stockbridge for the first time acknowledged that Winmark and I should have independent counsel. Miles & Stockbridge referred Winmark and me to our independent counsel in this matter, the law firm of Whiteford, Taylor & Preston. Miles & Stockbridge nevertheless continued to represent the Bank against Winmark in connection with the construction loan without requesting or receiving Winmark's or my consent to such representation.

Appellants, therefore, were well aware of their claim against appellees far in advance of filing for Chapter 11 relief. In light of the onerous duty to disclose imposed upon appellants by the Bankruptcy Code, coupled with appellants' full knowledge of their claim against appellees, the application of judicial estoppel is appropriate in this case.

■ Before concluding, we shall address an ancillary assertion that appellants make in a last ditch effort to salvage their law suit. Appellants baldly assert that the "failure of Win-Mark to disclose the potential litigation in its Chapter 11 case should not result in the extension of judicial estoppel to bar claims of Winer and Sapperstein, as guarantors." Appellants fail to undergird this naked assertion with supporting authority. Nor do they offer any sort of explanation or reasoning to buttress their position. In this regard, MARYLAND RULE 8–504(a)(5) (1996), which requires an appellate brief to contain an "[a]rgument in support of the party's position," has been violated—or is at least dangerously close to being violated. Were this matter not of some significance, we would be inclined not to address it. We shall do so, however, given its importance. As we explain, we reject this assertion.

Winer and Sapperstein are the general partners of Win-Mark. As such, they stand in an extremely close business and legal relationship with WinMark. Indeed, with respect to the claim against appellees and with respect to the bankruptcy proceedings, their interests—legal, financial, or otherwise—are totally and inextricably aligned with the interests of WinMark. For example, Winer, Sapperstein, and WinMark are each individual "Releasors" under the General Release. As their signatures on various other documents in the record indicate, Winer and Sapperstein closely dealt with appellees throughout the course of the workout negotiations. Winer declared under penalty of perjury to the truth and accuracy of the various documents submitted to the bankruptcy court. Given this close relationship, WinMark's successes or failures during bankruptcy were Winer's and Sapperstein's successes or failures. In other words, as goes WinMark, so go Winer and Sapperstein, and vice versa. The same is true with respect to appellants' claim against appellees. Thus, just as it was in WinMark's interest (and was its duty) to disclose its claims against appellees during the bankruptcy proceedings, it was in Winer's and Sapperstein's interests (and was their duty) to see to it that such disclosure was made. Winer and

Sapperstein, for all intents and purposes, are the alter egos of WinMark.

According to BLACK'S LAW DICTIONARY 1199 (6th ed. 1990) (citations omitted):

> In its broadest sense, "privity" is defined as mutual or successive relationships to the same right of property, or such an identification of interest of one person with another as to represent the same legal right. Derivative interest founded on, or growing out of, contract, connection, or bond of union between parties; mutuality of interest.
>
>      *      *      *      *      *      *
>
> Privity signifies that relationship between two or more persons is such that a judgment involving one of them may justly be conclusive upon other, although other was not party to lawsuit.

In light of the closeness of their relationship to WinMark and the way in which the interests of appellants are bound inextricably, we are convinced that Winer and Sapperstein, at least with respect to the claim against appellees and the bankruptcy proceedings, stood in a relationship of close privity with WinMark.

     Given this privity, we are satisfied that it is appropriate to apply judicial estoppel in this case. At the same time, however, we recognize that there is no direct Maryland case law supporting our decision to estop Winer and Sapperstein—who were in privity to WinMark, but who technically were not parties in the prior bankruptcy proceeding—from asserting this malpractice claim. Nonetheless, well-recognized principles borrowed from other closely related equitable doctrines, such as collateral estoppel and equitable estoppel, support our decision to apply judicial estoppel under the circumstances of the instant case. *In re Cassidy*, 892 F.2d 637, 642 (7th Cir.1990) (judicial estoppel is an equitable doctrine the application of which is, therefore, in the court's sound discretion); *In re H.R.P. Auto Ctr.*, 130 B.R. at 254 ("Judicial estoppel is an equitable doctrine governed by general equitable principles.").

Under the doctrine of collateral estoppel, for example, the party against whom the particular doctrine is asserted must have been a party or *in privity* with a party in the prior litigation. *See MPC, Inc. v. Kenny,* 279 Md. 29, 32, 35, 367 A.2d 486 (1977); *Pope v. Board of Sch. Comm'rs,* 106 Md.App. 578, 594, 665 A.2d 713 (1995). Similarly, with regard to equitable estoppel, it has been recognized that *"[e]xcept where the acts of one, who has dual capacity as representative and individual, are so connected and associated that it is impossible to distinguish his actions in one capacity from the other, or where the act performed in a representative capacity has resulted in individual profit,* an act done in a representative capacity will not estop one in his individual capacity, and vice versa." 31 C.J.S. *Estoppel* § 134 (1964) (emphasis added). *Cf.* 31 C.J.S. *Estoppel* § 119 (for judicial estoppel to apply, "it *may* be necessary that the parties be the same....") (emphasis added), § 121 ("Estoppels by allegations or admissions in pleadings in a former action or proceeding arise only in favor of or against the parties to that action or proceeding and those *in privity with them....*") (emphasis added), and § 131 ("Parties and *privies* may be subject to an estoppel in pais,[7] and there is authority holding that the estoppel may be claimed against any person responsible for a representation although he is not jointly interested in the transaction.") (emphasis added).

Moreover, as explained in *Pat Perusse Realty Co. v. Lingo,* 249 Md. 33, 36, 238 A.2d 100 (1968), the Court of Appeals of Maryland has previously touched upon this issue:

In *Williams v. Messick,* 177 Md. 605 [11 A.2d 472] [ (1940) ], an individual defendant who was the majority stockholder and manager of a corporation defended a suit

---

7. According to at least one court, judicial estoppel is also known as "estoppel in pais." *Levinson v. U.S.,* 969 F.2d 260, 264 (7th Cir.1992). Whether all courts consider judicial estoppel to be one in the same with estoppel in pais is unclear. *See* BLACK'S LAW DICTIONARY 551 (6th ed. 1990) (estoppel in pais is the "doctrine by which a person may be precluded by his act or conduct, or silence when it is his duty to speak, from asserting a right which he otherwise would have had.").

seeking a receiver for the corporation by asserting that the identical issues had previously been litigated in a suit directly against the corporation. The Court of Appeals went outside the record and, on a point not raised or argued, assumed mutuality by assuming that the individual defendant had actually controlled the defense of the first suit because he was the majority stockholder and manager of the corporation.

Thus, Maryland has long since recognized that the "wall of mutuality" of estoppel has never been solid. *Id.* at 36, 238 A.2d 100. So long as the party against whom a judgment is sought to be used had a full and fair opportunity to be heard on the issue, that party's rights were satisfied. *Id.* at 45, 238 A.2d 100. In this case, we have no doubt that Winer's and Sapperstein's rights will not be abridged by the application of judicial estoppel, because they had their day in court in light of their privity relationship with WinMark and control over the bankruptcy proceedings.

Appellants have not identified, nor do we see, any reason why the privity principle employed in the related equitable doctrines referred to above may not also be applied to the doctrine of judicial estoppel. Consistent with the foregoing principles expressed in these related doctrines, the close privity relationship among and between appellants justifies our application of judicial estoppel to bar Winer's and Sapperstein's malpractice claims against appellees—in addition to barring WinMark's claim. Our holding in this regard is further supported under the policy served by the doctrine of judicial estoppel. *See, e.g., Oneida,* 848 F.2d at 419 ("Judicial estoppel looks to the connection between the litigant and the judicial system while equitable estoppel focuses on the relationship between the parties to the prior litigation."); *Konstantinidis,* 626 F.2d at 937 ("in contrast to equitable estoppel's concentration on the integrity of the parties' relationship to each other, judicial estoppel focuses on the integrity of the judicial process.").

## POSTSCRIPT

We affirm the circuit court's grant of summary judgment. Our decision herein should not be construed as this Court's position that dual representation by counsel, even pursuant to a lawfully-executed waiver, is to be favored. Law firms should be cognizant of the perception of impropriety as well as the ethical and legal pitfalls looming when representing both sides of the same transaction. The exposure to liability and second-guessing may not be worth the risks no matter what type of preliminary precautions are taken. We recognize that counsel may have been motivated by the possibility of assuming the role of mediator as much as the maximizing of fees. At no time, however, did counsel act as mediator, nor could such a function be performed by a law firm retained by two adverse parties to a workout arrangement where legal advice was to be rendered to both sides. Counsel might do well to heed the maxim, "No man can serve two masters."

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANTS.**